IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| LUNAREYE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 9:05-CV-188 |
| v. | § | |
| | § | |
| INDEPENDENT WITNESS, INC., ET AL. | § | JUDGE RON CLARK |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF**
**UNITED STATES PATENT NO. 6,484,035**

Plaintiff LunarEye, Inc. ("LunarEye") filed suit against Defendants Independent Witness, Inc. ("IWI"), BP America Production Company and BP America, Inc., (collectively "Defendants") claiming infringement of United States Patent No. 6,484,035 ("the '035 patent"). The court conducted a *Markman* hearing to assist the court in interpreting the meaning of the claim terms in dispute. Having carefully considered the patent, the prosecution history, the parties' briefs, and the arguments of counsel, the court now makes the following findings and construes the disputed claim terms as follows.

**I. Claim Construction Standard of Review**

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996) ("*Markman II*"). "The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (citations omitted).

"'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

The words of a claim are generally given their ordinary and customary meaning. *Phillips* 415 F.3d at 1312. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[1] *Id.* at 1313. Analyzing "how a person of ordinary skill in the art understands a claim term" is the starting point of a proper claim construction. *Id.*

A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Where a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean. *Id.* at 1414. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (citation omitted).

---

[1] Based on the patent and the representations of the parties at the hearing, the court finds that in this case such a person would have at least a Bachelor's degree, in a field such as computer science, engineering or the technical aspects of communications. The person would also have a minimum of two years experience in the field.

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. In these instances, a general purpose dictionary may be helpful. *Id.*

However, the Court emphasized the importance of the specification. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A court is authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treaties. *Phillips*, 415 F.3d at 1317. But their use should be limited to edification purposes. *Id.* at 1319.

The "'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321. However, the patentee may deviate from the plain and ordinary meaning by characterizing the invention in the prosecution history using words or expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). It is clear that if the patentee clearly intended to be its own lexicographer, the "inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

The intrinsic evidence, that is, the patent specification, and, if in evidence, the prosecution history, may clarify whether the patentee clearly intended a meaning different from the ordinary meaning, or clearly disavowed the ordinary meaning in favor of some special meaning. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995). Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to

3

deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

## II. Claim Construction - The '035 patent

Alvin C. Allen is the inventor of United States Patent No. 6,484,035, which was filed November 13, 2001. It is a continuation of U.S. Patent application Ser. No. 09/206,627 filed December 7, 1998. The assignee is LunarEye, Inc. The '035 patent describes methods and an apparatus for determining the location of an object, or person using the Global Positioning Satellite System (GPS), and transmitting that location in response to certain "trigger events." In general, a page receiver sends a signal to a GPS unit, which causes it to determine the location of the object or person. The resulting GPS signal is transmitted by a telemetry transmitter, such as a cellular network telemetry transmitter.

The five disputed terms are contained in claim 3. This section is set out below with the disputed terms in bold.

> 3. A triggerable location-reporting apparatus comprising:
> a location-signal generating device configured to produce a location signal including location data **when enabled**;
> a data selecting device for selecting less than all of the location data to include in the location signal;
> a **telemetry transmitter** coupled to the data selecting device configured to transmit the location signal **when enabled**; and
> an **enable controller** configured **to enable** the location-signal generating device and the **telemetry transmitter** when it receives a trigger signal and **to disable** the location-signal generating device and the **telemetry transmitter** after the **telemetry transmitter** transmits the location signal;
> wherein the data selecting device reorders the selected location data.

**"When enabled," "To enable" and "Disable"**

For "when enabled" and "to enable," Plaintiff proposes "when activated" and "to activate," respectively. Defendants suggest "when power is supplied, *i.e.,* when the device is turned on." On the flip side, Plaintiff argues that "disable" should be defined as "to deactivate." Defendants submit that the construction of "disable" should be "to switch off power, i.e., to turn off."

Claim 3 uses the terms "enabled," "to enable" and "disabled," but the specification includes no special definition of these terms. Plaintiff argues first that no definition is needed, and that the "plain and ordinary" meaning of the terms should suffice. As with so many patents involving electronic devices, "plain and ordinary" is not so easy to discern.

Defendants correctly argue that these terms are used in the specification in connection with a power management feature of the invention. At times, the described devices (the location signal generating device and the telemetry transmitter) use no power, i.e. they are turned off. When a signal is received, power is turned on, and they are able to operated. In other words, according to Defendants, the claim merely describes devices similar to a common electric lamp. When the switch is in the "on" position, the light bulb is illuminated. When in the "off" position, the bulb is dark.

LunarEye asserts that the claim language should not be so limited. LunarEye would interpret the claim to also describe devices which continuously receive power, although they might be in a "low" power condition, so that power consumption is minimized. This would be similar to the "hibernation" state observed in some computers and cell phones, which have a blank screen when not used for a certain period of time, although they are still using some power.

Defendants argue that because the specification and prosecution history do not disclose any embodiment that does not involve power being turned off and on, the claim must be so defined. *See Wang Laboratories, Inc. V. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999). Plaintiff naturally reminds the court that limitations may not be imported into the claim from the specification. See *Telefex, Inc. V. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002)

But review of contradictory axioms is not analysis. *Liebel-Flarsheim Co. V. Medrad, Inc.*, 358 F3d 898, 904 (Fed. Cir. 2004). The court must determine if there is either a limitation in the claim language itself, or a clear intent to limit the claim expressed in the specification or prosecution history.

The claim simply refers to devices being "enabled" and "an enable controller" configured "to disable" devices. This could mean, as Defendants argue, that the devices have all power supply turned off. But anyone who owns a computer or a cell phone, let alone someone skilled in the art, would be aware that such devices can be in a "hibernation" or "sleep" mode, in which they receive a small amount of power.

The question then becomes whether the applicant expressed a clear intent to limit the claim scope. According to the specification, the invention's operational sequence may begin "[u]pon receipt of a page or the occurrence of another triggering action . . . ." Col. 1, L. 63-64. This does not indicate whether the device is already using some low level of power.

The "method may include applying power to a GPS receiver and a cellular transmitter upon receipt of the page, and disconnecting power from the GPS receiver and the cellular telemetry transmitter upon transmission of the location of the object." Col. 2, L. 39-43. "Disconnecting power" implies that all power is shut off. But, this is just a description of one variation of the invention.

A flow chart of the power management system is provided by Figure 3 of the patent. The verbal description of the flow chart states that the "[t]he controller wakes up the GPS receiver . . . .," which then "wakes up" the cellular network transmitter. Col. 6, L. 26-28. The prosecution history contains a communication from the Patent Examiner with the following references:

"a controller 25 (enable controller) configured to wake-up (enable) the LDS . . . ."

"to put back to sleep (disable) the LDS receiver/processor . . . ."

 See Independent Witness' Brief, Ex. 2, [Doc. # 84-3] p. 7. There seems to be little dispute that "enable," as used by the inventor, and as understood by the Examiner, is synonymous with "wake up." Similarly, "disable" can be used interchangeably with "put to sleep."

Together, these references indicate that "to enable " and "when enabled" (or "waking up") requires the application of power. Conversely, "to disable" (or "put to sleep"), involves the removal or reduction of power.

The question still remains: Does the claim describe only a device which receives no power until it is "enabled?" In an Office Action (Date Mailed: 07/12/01) the Examiner compared Claim 26 of Allen's application, (which later became the Claim 3 now in dispute) with language in an earlier, related, patent, U.S. Patent No. 5,777,580 (Janky) Col. 11, L. 26-40. As a basis for rejecting Claim 26 of Allen's application, the Examiner states that "Janky et. al. clearly show and disclose a vehicle location system (triggerable location-reporting apparatus)" with the same features disclosed in Allen's Claim 26. See Independent Witness Brief, DX 2 [Doc. # 84-3] p. 7 of 15.

The Examiner noted that Janky already taught an enable controller configured to "**wake-up (enable)**" the LDS[2] receiver/processor (location signal generating device) and the telemetry transmitter when it receives a trigger signal, and, inherently, to "**put back to sleep (disable)**" the location signal generating device and the telemetry transmitter. *See* DX 2, [Doc. # 84-3] p. 7 of 15. (Emphasis added)

On the next page of the Office Action, the Examiner stated: "Janky et. al. further disclose that the GPS processor is in a **'sleeper' mode (power is not applied)** until the system receives a page (column 11 lines 35-40)." (Emphasis added). Nothing in the record indicates that Allen ever tried to contradict or correct the Examiner's obvious understanding that "disable" meant "put back to sleep" and "sleeper mode" meant "power is not applied." On the other hand, whether or not power was being turned off, or merely reduced, was not the focus of the interchange between the Examiner and Allen.

The "Response To Final Office Action" states that "the enable controller in Janky <u>does not necessarily</u> disable the location-signal generating device and the telemetry transmitter after the telemetry transmitter transmits the location signal, as required by claim 26 [now claim 3 in the patent before the court], and Janky does not inherently include this limitation." (Emphasis in the original) [IW's Brief, EX. 4, Doc. # 84-4, p. 10 of 18]. The Response explained to the Examiner that Claim 26 [now claim3] can be distinguished from Janky because the system in Janky "may leave the system enabled" until it is "unenabled" *sic* by a person performing an action such as removing power, rather than by the enabler itself. In other words, Allen distinguished his

---

[2] In Janky, an LDS is a "Location Determination System" such as GPS, GLONASS, Loran or an inertial navigation system that receives LDS signals from two or more sources. *See* Janky, Abstract.

patent by asserting that the controller would accomplish a task performed by a person. But there was no clear statement that the task could not be a reduction of power.

The argument that "sleep" or "sleeper mode" means "no power" could be supported by the specification's description of the power management flow chart, Figure 3.

> The controller then goes back to sleep. **72** With this power management approach, significant power is being used only when position information is being transmitted over the cellular network. **The rest of the time the only drain on system power is the page receiver**, which has a very low power requirement . ..

Col. 6, L. 33-38. (Emphasis added). If the "only drain" is the page receiver, then the GPS and the transmitter must be using no power at all. This conclusion is supported by the following at Col. 5, L. 62-64: "When the page receiver **34** receives a page over antenna **44** that is addressed to the page receiver **34**, the page receiver **34** transmits a "**power-on**" signal **46** to the controller **36**." (Emphasis added).

The foregoing are the strongest arguments for defining "enabled" as meaning that power is supplied or "tuned on." But none is a "clear disclaimer" of other possibilities. There is no statement that the GPS the (location signal generating device)or the telemetry transmitter could not be, or would not be in a low power state. The single statement by the patent examiner about a GPS processor in a "sleeper mode (power is not applied)" referred specifically to Janky and how much power was being applied or removed was not the focus of debate. The court can not merely assume or infer a "clear disclaimer."

The claim language is broad enough to encompass an enable controller which turns the devices completely on and off, or a system in which in which at least some power is continuously

9

applied to the devices. While only one embodiment (the preferred embodiment) is described in the specification, there is no clear statement disclaiming other embodiments or limiting the devices. The court therefore defines these terms as follows:

> **"Enabled"** means "fully operational and performing its function."
>
> **"To enable"** means "to place into a condition which is fully operational and performing its function."
>
> **"To disable"** means "to place into a condition which is not fully operational and performing its function."

**"Telemetry transmitter."**

To define the term, Plaintiff proposes "any transmitter capable of wireless transmission." Defendants argues that the term means "cellular network based transmitter."

The parties did not dispute in their briefs or at the Markman hearing what a telemetry transmitter does. One skilled in the art would know, and the parties agree, that a telemetry transmitter simply transfers measurable data using telecommunication techniques. However, Defendants want to limit the term in this case to the use of a cellular-based transmitter, and Plaintiff wants to impose the limitation that the transmitter be wireless. There is simply no basis for either limitation.

As anyone who has seen a heart or fetal monitor in a hospital knows, telemetry can be transmitted over wires. Just because that may be impractical for most embodiments of the invention does not entitle Plaintiff to include that limitation.

As to Defendant's "cellular telephone" limitation, the specification is replete with descriptions of the transmission of data by satellite, and radio-telephoned. Col. 1, L. 64-65, Col. 2, L. 26-28, Col. 2, L. 44-45, Col. 2, L. 63-64. If there is any doubt, the specification states: "An alternative embodiment of the system that does *NOT* use the cellular network is illustrated in FIG. **10**." The specification then describes the use of a satellite. Col. 8, L. 29-30.

The court will define this term as follows:

**"Telemetry transmitter"** means "a device that transfers measurable data using telecommunication techniques or methods."

**"Enable controller."**

For this term, Plaintiff proposes, "a microprocessor or other computing device." Defendants suggest, "a microprocessor or other computing device that is configured to perform and actually performs specified tasks."

The parties do not dispute that the term "enable controller" means "a microprocessor or other computing device." The parties also agree that the enable controller must be configured to perform specified tasks, but Plaintiff argues that additional claim language already defines what the enable controller is required to do.

If the court inserts Defendants' proposed construction, an "enable controller" would be defined as "a microprocessor or other computing device that is configured to perform and actually performs specific tasks configured to enable the location-signal generating device and the telemetry transmitter when it receives a trigger signal . . .." This proposed definition is both confusing and unnecessary. It is clear that the functionality required by the enable controller is

11

already defined by the remainder of the claim limitation. Therefore, those limitations do not need to be imported into the construction of "enable controller" itself.

The court will define the term as follows:

**"Enable controller"** means "a microprocessor or other computing device."

### IV.  Conclusion

The jury shall be instructed in accordance with the court's interpretation of the disputed claim terms in the ' 035 patent.

So **ORDERED** and **SIGNED** this **3**  day of **October, 2006.**

_____
Ron Clark, United States District Judge